UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>FILIBERTO ZAVALA-CRUZ,<br><br>Defendant. | Case No. 19-cr-00701-WHO-1<br><br>**ORDER DENYING MOTIONS TO DISMISS THE INDICTMENT**<br><br>Re: Dkt. Nos. 22, 42, 52, 53 |

Before me are two motions to dismiss the indictment for illegal reentry following deportation in violation of 8 U.S.C. § 1326. Filiberto Zavala-Cruz argues that the immigration judge who issued his January 14, 2013 removal order did not have jurisdiction and his removal was fundamentally unfair due to ineffective assistance of counsel, denial of counsel, and the immigration judge's failure to advise him on his eligibility for voluntary departure. If Zavala had received voluntary departure in 2013, he could not be prosecuted criminally for re-entering the country after being removed in January 2013.

Zavala's Notice to Appear ("NTA") was defective because it did not include the address of the immigration court, but he received subsequent notices which included the omitted information and properly vested the immigration judge of jurisdiction. He cannot show that his 2013 removal was fundamentally unfair; it is not plausible that the immigration judge would have granted him voluntary departure given his prior immigration and criminal history, despite the positive equities in his case. For these reasons, both motions to dismiss are DENIED.

# BACKGROUND

## I. FACTUAL BACKGROUND

### A. Before Removal Proceedings

Zavala is a citizen of Mexico. Between 2002 and 2004, he was apprehended by United States Border Patrol Agents seven times for being present in the United States without admission at or near the Mexican border. Declaration of Oren Avneri in Support of Government's Opposition to Defendant's Second Motion to Dismiss Indictment ("Avneri Decl.") [Dkt. No. 49], Ex. A.

Sometime between 2007 and 2008, Zavala was arrested in Mendocino County. *See* Declaration of Calvin Choi in Support of Government's Opposition to Defendant's Motion to Dismiss Indictment ("Choi Decl.") [Dkt. No. 27] Ex. B (court records from Mendocino County Superior Court). He pleaded guilty to a felony offense for preventing or dissuading a witness by force or threat and misdemeanor spousal battery. *Id.*

Zavala was subsequently interviewed by United States Immigration and Customs Enforcement ("ICE") and signed a form in which he admitted that he was in the United States illegally, waived the right to a hearing before the immigration court, and stated that he wanted to return to his country as soon as arrangement could be made. Choi Decl., Ex. D (April 17, 2008 Notice of Rights and Request for Disposition). He was granted voluntary return to Mexico "due to no known criminal convictions and lack of bed space." *Id.*, Ex. C (April 17, 2008 Report of Deportable/Inadmissible Alien). Zavala returned to Mexico on April 18, 2008. *Id.*, Ex. E.

### B. 2012 Conviction and Removal Proceedings

On August 2, 2012, Zavala was charged with weapons-related offenses and unlawful possession of a wild pig in Lake County. Declaration of Jason Kleinwaks in Support of Government's Opposition to Defendant's Second Motion to Dismiss Indictment ("Suppl. Kleinwaks Decl.") [Dkt. No. 50], Ex. C (court records from Lake County Superior Court). On October 29, 2012, the weapons-related charges were dismissed and he pleaded no contest to two Fish and Game misdemeanors for unlawful possession of a wild pig. *Id.* He then entered removal proceedings.

On October 31, 2012, he was transferred from Lake County jail to ICE custody and held in the detention unit at the ICE office in San Francisco. Choi Decl. ¶ 8. There, ICE generated a NTA for removal proceedings, which set forth factual allegations against him regarding his unlawful presence in the United States. Declaration of Amy Senia in Support of Defendant's Motion to Dismiss ("Senia Decl.") [Dkt. No. 23] Ex. C (October 31, 2012 NTA).

The NTA contained blank spaces for the date and time of the hearing and for the "Complete Address of Immigration Court, including Room Number, if any." Senia Decl., Ex. C. The NTA stated that the date and time were "to be set" and the address space was left blank. *Id.* The Certificate of Service box indicated that Zavala was personally served the NTA on October 31, 2012, but the blank space for Zavala's signature has a handwritten notation stating "refused". *Id.* Zavala alleges that he has never seen this document before his attorney in this case showed it to him, and that agents never asked him to sign the document so he never "refused" to sign it. Declaration of Filiberto Zavala Medina in Support of Motion to Dismiss ("Zavala Decl.") [Dkt. No. 38] ¶ 10. The same day, on October 31, 2012, Zavala was transferred to Eloy Detention Center in Eloy, Arizona. Senia Decl., Ex. G (Detainee Transfer Notification). The space for "All charging documents have been served on alien and copies provided to them" was left unchecked in his transfer form. *Id.*

On November 6, 2012, the immigration court generated a Notice of Hearing in Removal Proceedings ("NOH"), which stated that Zavala's removal hearing would take place on November 21, 2012 at 8:30 A.M. at the Eloy Detention Center at 1705 East Hanna Road, Suite 366 in Eloy, Arizona. Choi Decl., Ex. L. The Certificate of Service indicates that it was served to Zavala "c/o Custodial Officer." *Id.*

Also on November 6, 2012, Grady Gauthier, Zavala's attorney in Fort Bragg, California, filed a notice of appearance and a motion for bond hearing. Choi Decl., Ex. M; Declaration of Grady Gauthier in Support of Motion to Dismiss ("Gauthier Decl.") [Dkt. No. 37] Ex. A (bond motion with supporting exhibits). An identical NOH regarding the November 21, 2012 hearing was mailed to Gauthier on November 7, 2012. Choi Decl., Ex. N.

3

### 1. November 21, 2012 & December 17, 2012 Master Hearings

Zavala, who was in ICE custody, appeared at the removal hearing on November 21, 2012, but his attorney, Gauthier, failed to appear in person or telephonically. Senia Decl., Ex. E at Audio File 2. Consequently, the immigration judge ("IJ") rescheduled the hearing to December 17, 2012. *Id.* On the same day, the immigration court mailed Gauthier an updated NOH with the new removal hearing date of December 17, 2012. Choi Decl., Ex. P.

Gauthier appeared telephonically at Zavala's hearing on December 17, 2012. Senia Decl., Ex. E at Audio File 3. Gauthier made arguments for Zavala's release from custody but the IJ explained that the proceeding was a removal hearing, not a custody redetermination hearing. *Id.* Gauthier then admitted the charges in the NTA on Zavala's behalf and asked for voluntary departure relief. *Id.* The IJ set Zavala's merits hearing for January 14, 2013. *Id.* On the same day, the immigration court mailed Gauthier a NOH for the January 14, 2013 proceeding, which indicated that all documents, briefs, and motions were due by January 7, 2013. Declaration of Jason Kleinwaks in Support of the United States' Opposition to Defendant's Motion to Dismiss the Indictment ("Kleinwaks Decl.") [Dkt. No. 31] Ex. A.

There is no evidence that Gauthier filed any documents supporting voluntary departure by the January 7, 2013 deadline. DHS counsel submitted four exhibits, including I-213 forms from April 17, 2008 and August 2, 2012, the conviction documents from Zavala's 2008 case and a police report from his 2012 charges. Second Declaration of Amy Senia in Support of Defendant's Motion to Dismiss [Dkt. No. 43], Ex. F.

### 2. January 14, 2013 Merits Hearing

Gauthier failed to appear at the merits hearing on January 14, 2013. Senia Decl., Ex. E at Audio File 4. The IJ asked Zavala where Gauthier was, and he responded that Gauthier was in California and that he decided to represent himself because Gauthier was unable to get him out on bond, explaining "there's nothing else really to do, I'd rather just go to Mexico." *Id.*; Choi Decl., Ex. R (December 20, 2012 order denying bond for lack of jurisdiction). The IJ called Gauthier to ask why he was not present in-person in court. Senia Decl., Ex. E at Audio File 4. It appears that Gauthier did not know he had to be present in-person. *Id.* He began to make argument for

4

voluntary departure, but the IJ interjected, saying "No, no, no, I'm not giving you the privilege." *Id.*

Gauthier then disclosed that Zavala had expressed he no longer wanted his services and asked to be relieved of his representation. Senia Decl., Ex. E at Audio File 4. The IJ asked Zavala "Do you want Mr. Gauthier to represent you or not?" *Id.* Zavala answered, "Well, I just want to leave now." *Id.* The IJ responded, "Not my question, sir" and Zavala replied, "No, well, I'm going to represent myself." *Id.* The IJ asked if he was sure and Zavala said yes. *Id.* The IJ determined that Zavala no longer wanted Gauthier's assistance and permitted Gauthier to withdraw. *Id.* The IJ proceeded to ask Zavala if he understood that he was giving up his right to an attorney, if he was going to represent himself, and if was ready to proceed, all of which Zavala confirmed. *Id.*

The IJ determined, and confirmed with the government, that Zavala was statutorily eligible for pre-hearing voluntary departure. Senia Decl., Ex. E at Audio File 4. The IJ then began to ask Zavala a series of questions, including: "How old are you?" "Married or single?" "Do you have any children?" "Which country were they born in?" "How old are they?" "Do you have any siblings here in the United States?" "When did you first come to the United States?" "Have you been employed here in the United States?" "Where were you last employed?" "How long did you work there?" *Id.*

The IJ asked "Sir, why do you want voluntary departure?" Senia Decl., Ex. E at Audio File 4. In his declaration, Zavala claims that he did not know what voluntary departure meant at the time and he did not understand the question. Zavala Decl. ¶ 22. Zavala replied that he has sole custody of his two daughters who he needed to support. Senia Decl., Ex. E at Audio File 4. The IJ responded, "Well, sir, voluntary departure means you'll be returning to your own country Mexico." *Id.* Once again, the IJ asked Zavala why he wanted voluntary departure. *Id.* Zavala responded, "Well I mean, I don't know if I could get bond or something. It's not worth it to be here if I can't get a bond." *Id.* The IJ asked if Zavala had anything else to add, and he replied that he did not. *Id.*

The IJ denied voluntary departure because "the negative factors outweigh the positive

5

1    factors," and specifically mentioned that Zavala's criminal convictions from 2008 and a recent
2    weapons-related offense outweighed "any positive factors."  Senia Decl., Ex. E at Audio File 4.
3    When the IJ asked if Zavala understood his decision, Zavala said that the weapons were not his,
4    but his "buddies". *Id.*  The IJ responded that he was denying voluntary departure "regardless"
5    because of his 2008 convictions for dissuading a witness and spousal battery. *Id.*  Zavala asked
6    what was going to happen next and the IJ explained that he would be sent to Mexico shortly. *Id.*
7    The IJ also explained that if Zavala wanted the IJ's decision to be final, he would have to waive
8    his right to appeal, which Zavala then did. *Id.*

9    Zavala was removed the next day on January 15, 2013. Choi Decl., Ex. T (January 14,
10   2013 Removal Order); *id.*, Ex. V (January 15, 2013 Warrant of Removal/Deportation).  The
11   indictment alleges that Zavala was found in the United States on or about October 17, 2016.

12   **II.    PROCEDURAL BACKGROUND**

13   On March 19, 2020, Zavala moved to dismiss the indictment on grounds that the
14   government cannot establish a predicate element of the sole offense because jurisdiction never
15   vested in the immigration court, voiding the January 14, 2013 removal order.  Motion to Dismiss
16   the Indictment ("First MTD") [Dkt. No. 22].  I granted Zavala's request for continuance in light of
17   the Ninth Circuit's recent opinion in *Aguilar Fermin v. Barr*, No. 18-70855, on May 7, 2020.
18   Zavala filed a second motion to dismiss on June 8, 2020, on grounds that he is entitled to relief
19   under section 1326(d) due to ineffective assistance of counsel, denial of counsel, and the IJ's
20   voluntary departure errors.   Second Motion to Dismiss the Indictment ("Second MTD") [Dkt. No.
21   42]. I heard oral argument on both motions on July 23, 2020.

**LEGAL STANDARD**

**I.    MOTION TO DISMISS AN INDICTMENT**

24   Under Federal Rule of Criminal Procedure 12(b)(3)(B)(v), a defendant may move to
25   dismiss an indictment on the ground that the indictment "fail[s] to state an offense."  In
26   considering a motion to dismiss an indictment, a court must accept the allegations in the
27   indictment as true and "analyz[e] whether a cognizable offense has been charged." *United States*
28   *v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002).  "In ruling on a pre-trial motion to dismiss an

6

1  indictment for failure to state an offense, the district court is bound by the four corners of the
2  indictment." *Id.* A motion to dismiss an indictment can be determined before trial "if it involves
3  questions of law rather than fact." *United States v. Shortt Accountancy Corp.*, 785 F.2d 1448,
4  1452 (9th Cir.), *cert. denied,* 478 U.S. 1007 (1986).

## II. COLLATERAL ATTACK ON A DEPORTATION

"For a defendant to be convicted of illegal reentry under 8 U.S.C. § 1326, the Government must establish that the defendant left the United States under order of exclusion, deportation, or removal, and then illegally reentered." *United States v. Raya-Vaca*, 771 F.3d 1195, 1201 (9th Cir. 2014) (internal quotation marks and citation omitted). "A defendant charged under [section] 1326 has a due process right to collaterally attack his removal order because the removal order serves as a predicate element of his conviction." *Id.* (internal quotation marks and citation omitted).

To demonstrate that a prior deportation cannot serve as the basis for an indictment for illegal reentry, 8 U.S.C. § 1326(d) requires that a defendant "demonstrate that (1) he exhausted the administrative remedies available for seeking relief from the predicate removal order; (2) the deportation proceedings 'improperly deprived [him] of the opportunity for judicial review'; and (3) the removal order was 'fundamentally unfair.'" *Raya-Vaca*, 771 F.3d at 1201 (quoting 8 U.S.C. § 1326(d)) (brackets in original). "To satisfy the third prong—that the order was fundamentally unfair—the defendant bears the burden of establishing both that the deportation proceeding violated his due process rights and that the violation caused prejudice." *Id.* (internal quotation marks, citation, and brackets omitted).

## DISCUSSION

## I. FIRST MOTION TO DISMISS

### A. Regulatory Framework and Relevant Ninth Circuit Case Law

In *Karingithi v. Whitaker*, the Ninth Circuit held that the regulatory definition of a NTA governs whether jurisdiction has vested in the immigration court, not the statutory definition set forth in the Immigration and Nationality Act ("INA"). 913 F.3d 1158 (9th Cir. 2019), *cert. denied sub nom. Karingithi v. Barr*, 140 S. Ct. 1106 (2020). In so holding, it narrowed the reach of the Supreme Court's decision in *Pereira v. Sessions*, 138 S. Ct. 2105 (2018), which involved a

7

deficient NTA in the context of the stop-time rule and looked to the statutory requirements of a NTA.[1]

Under the relevant regulations, "[j]urisdiction vests, and proceedings before an Immigration Judge commence, when a charging document is filed with the Immigration Court by the Service." 8 C.F.R. § 1003.14(a). A "[c]harging document means the written instrument which initiates a proceeding before an Immigration Judge," and includes a "Notice to Appear." 8 C.F.R. § 1003.13. Although the statute at 8 U.S.C. § 1229(a)(1)(G)(i) defines a NTA as including, among other things, the "time and place at which the proceedings will be held," the Ninth Circuit in *Karingithi* noted that the regulation at 8 C.F.R. § 1003.15(b) "does not require that the time and date of a proceedings appear in the initial notice." 913 F.3d at 1160. "Rather, the regulation compels inclusion of such information '*where practicable*.'" *Id.* (quoting 8 C.F.R. § 1003.18(b)) (emphasis added). When that information is not contained in the NTA, the regulation requires the IJ to "schedul[e] the initial removal hearing and provid[e] notice to the government and the [noncitizen] of the time, place, and date of hearing." *Id.* (quoting 8 C.F.R. § 1003.18(b)).

The initial NTA in *Karingithi* failed to specify the time and date of the removal proceedings, but jurisdiction still vested because the petitioner received a subsequent NOH specifying the omitted information. 913 F.3d at 1161–62. However, *Karingithi* did not squarely decide the implications of a NTA that does not provide an address, as is the case here.

Unlike time and date, 8 C.F.R. § 1003.15(b) provides that "[t]he address of the Immigration Court where the Service will file" must be included in the NTA. Courts in this District have been split as to what happens in such a circumstance. *Compare United States v. Gutierrez-Ramirez*, No. 18-CR-00422-BLF-1, 2019 WL 3346481 (N.D. Cal. Jul. 25, 2019)

---

[1] *Pereira* involved a deficient NTA in the context of the stop-time rule. Generally, nonpermanent residents who are subject to removal proceedings may be eligible for cancellation of removal if, among other things, they have "been physically present in the United States for a continuous period of not less than 10 years immediately preceding the date of [an] application." 8 U.S.C. § 1229(b)(1)(A). Under the stop-time rule, the period of continuous presence is "deemed to end . . . when the [noncitizen] is served a [NTA] under section 1229(a)." 8 U.S.C. § 1229(d)(1)(A). Section 1229(a) requires that a NTA specify, among other things, "[t]he time and place at which the [removal] proceedings will be held." *Id.* § 1229(a)(1)(G)(i). The Supreme Court found that because Pereira's NTA merely ordered him to appear before an immigration judge in Boston "on a date to be set at a time to be set," it did not trigger the stop-time rule. *Pereira*, 138 S. Ct. at 2108.

1  (granting dismissal); *United States v. Rosas-Ramirez*, 424 F. Supp. 3d 758 (N.D. Cal. 2019)
2  (granting dismissal); *with United States v. Mendoza*, No. 18-CR-00282-HSG-1, 2019 WL
3  1586774 (N.D. Cal. Apr. 12, 2019) (denying dismissal); *United States v. Arteaga-Centeno*, No.
4  18-CR-00332-CRB-1, 2019 WL 3207849, at *7 (N.D. Cal. Jul. 16, 2019) (denying dismissal).

The Ninth Circuit's recent opinion in *Aguilar Fermin v. Barr*, 958 F.3d 887 (9th Cir. 2020) addresses this question. In that case, petitioner moved to reopen her removal proceedings on the grounds that her NTA was deficient because it did not include the address of the immigration court. *Id.* at 889. Relying on the Board of Immigration Appeals' ("BIA") decision in *Matter of Rosales Vargas*, 27 I. & N. Dec. 745, 750 (BIA 2020), the Ninth Circuit acknowledged that although "[section] 1003.15(b)(6) appears to be a clear statement that a notice to appear must include the address of the Immigration Court," when read in conjunction with section 1003.18(b), a failure to include the address is not fatal to the immigration court's jurisdiction. *Id.* at 895. Therefore, "[g]iven that the regulations expressly state that the omission of an address from an NTA may be fixed by a later hearing notice, it is reasonable to construe the regulatory provisions about when jurisdiction vests as allowing the IJ to assert jurisdiction in such circumstances." *Id.* Although petitioner's NTA was deficient under section 1003.15(b)(6) because it did not include the immigration court's address where the NTA will be filed, the subsequent NOHs she received, pursuant to section 1003.18(b), contained this information and therefore the IJ had jurisdiction to issue her removal order. *Id.*[2]

---

[2] I briefly address why the government's argument that the regulations are claim-processing rules, and not jurisdictional, is unconvincing. The Ninth Circuit in *Aguilar Fermin* found "*Rosales Vargas* and *Karingithi* are consistent" to the extent that both decisions held that "an omission of some of the information required by [section] 1003.14(a) and [section] 1003.15(b)(6) can be cured and is not fatal." *Aguilar Fermin*, 958 F.3d at 895. It did not adopt *Rosales Vargas*'s holding that the regulations are claim-processing rules. Instead, it reiterated its previous holding in *Karingithi* that the regulations define when the immigration court's jurisdiction vests. *Id.* at 893 ("We noted that immigration court jurisdiction is defined by DOJ regulations[.]") (citing *Karingithi*, 913 F.3d at 1160–61); *see also United States v. Ceja-Melchor*, No. 19-CR-00184-LHK, 2020 WL 1701976, at *7 (N.D. Cal. Apr. 8, 2020) (declining to follow *Rosales Vargas* because it contradicts with *Karingithi*, which is binding); *United States v. De Leon*, No. CR 19-00422 WHA, 2020 WL 2768959, at *3 (N.D. Cal. May 28, 2020) (rejecting government's argument that regulations are not jurisdictional because the Ninth Circuit "has explicitly held that the regulations define when the immigration court's jurisdiction vests, and has also accepted the idea that a failure to meet jurisdictional requirements could require the termination of proceedings").

9

**B.      Analysis**

Zavala argues that because his NTA failed to provide the address of the immigration court where the NTA will be filed pursuant to 8 C.F.R. § 1003.15(b)(6), jurisdiction never vested with the IJ and thus dismissal of the indictment is warranted. First MTD 1.

As described above, the Ninth Circuit's recent decision in *Aguilar Fermin* provides that lack of address information in the NTA does not deprive the immigration court of jurisdiction, as long as the noncitizen receives a subsequent hearing notice that contains such information. 958 F.3d at 894. The government asserts that, like the noncitizen in *Aguilar Fermin*, Zavala received notice of the address information in a subsequent Notice of Filing and many NOHs that were issued to him and his attorney of record in the proceedings. *See* Choi Decl., Ex. K (Notice of Filing personally served to Zavala on November 2, 2012); *id.*, Ex. L (NOH for November 21, 2012 master hearing personally served on Zavala "c/o Custodial Officer" on November 6, 2012); *id.*, Ex. N (NOH for November 21, 2012 master hearing mailed to Gauthier on November 7, 2012); *id.*, Ex. P (NOH for December 17, 2012 rescheduled master hearing mailed to Gauthier on November 21, 2012); Kleinwaks Decl., Ex. A (NOH for January 14, 2013 merits hearing mailed to Gauthier on December 17, 2012).

Zavala contends that like the NOHs in *Gutierrez-Ramirez* and *Rosas-Ramirez*, "[t]here is no evidence that the Custodian Officer ever actually served" the NOH that was allegedly personally served on him "c/o Custodial Officer" on November 6, 2012. First MTD 10; Choi Decl., Ex. L; *Rosas-Ramirez*, 424 F. Supp. 3d at 768 (quoting *Gutierrez-Ramirez*, 2019 WL 3346481 at \*6). But this argument only addresses why one of Zavala's subsequent notices is potentially deficient.

Zavala's attorney, Gauthier, received at least three NOHs with the address information regarding the master hearing on November 21, 2012, the rescheduled master hearing on December 17, 2012, and the merits hearing on January 14, 2013. *See* Choi Decl., Exs. N, P; Kleinwaks Decl., Ex. A. The regulatory provisions provide that "a Notice to Appear or Notice of Removal Hearing shall be served to the [noncitizen] in person, or if personal service is not practicable, shall be served by regular mail to the [noncitizen] or the [noncitizen's] attorney of record." 8 C.F.R. §

1003.13. Service to an attorney constitutes notice to a noncitizen. *See Saini v. I.N.S.*, 13 F. App'x 703, 704 (9th Cir. 2001) ("Because the INS properly served written notice of the hearing on Saini's counsel, Saini is deemed to have also received notice."); *De Martinez v. Ashcroft*, 374 F.3d 759, 762 (9th Cir. 2004) ("Service of an order to the [noncitizen's] attorney of record constitutes notice to the [noncitizen]."). Therefore, jurisdiction properly vested in the immigration court because service of the subsequent notices cured Zavala's defective NTA. *Aguilar Fermin*, 958 F.3d at 895.

As a separate argument, Zavala contends that even if the immigration court had jurisdiction pursuant to the regulatory requirements, it lacked statutory authority over his removal proceedings because he was not properly served with the NTA in the first place. *See* Reply to Government's Opposition to Defendant's Motion to Dismiss the Indictment ("First MTD Reply") [Dkt. No. 36] 3. He argues that *Karingithi*'s emphasis on the regulations over the statute does not preclude this separate inquiry because *Karingithi* did not address whether the agency had exceeded its *statutory authority* in issuing an NTA without complying with section 1229(a)(1), but rather, the requirements for an NTA to vest an immigration court with *subject matter jurisdiction*. The parties spend much time debating whether statutory authority and jurisdiction are identical concepts in this context.

Even if I accept Zavala's argument that statutory authority is a separate inquiry from jurisdiction, he fails to cite a case in which a court has followed his reasoning and voided a removal order based on a finding that the agency exceeded its statutory authority by failing to comply with section 1229(a). He relies on *Al Mutarreb v. Holder*, 561 F.3d 1023, 1031 (9th Cir. 2009) for the contention that where an agency lacks statutory authority, the removal order must be vacated because it is in essence a "legal nullity." First MTD Reply 10. However, in that case, the Ninth Circuit analyzed a particular section of the INA, section 1229a(b)(5)(A), to conclude that the IJ was without statutory authority to conduct removal proceedings in absentia. Section 1229a(b)(5)(C) provides a specific process by which a noncitizen can seek relief from a removal order in the form of a rescission when he demonstrates that notice did not comply with 1229(a) and that he failed to appear as a result. Because the IJ in *Al Mutarreb* lacked statutory authority in

11

those circumstances, the removal order was vacated. 561 F.3d at 1031 (citation omitted). Zavala's case does not involve a removal order in absentia.

The other cases on which he relies are equally unhelpful. Courts in those cases voided removal orders based on issues concerning either the agency's power to act or the substantive grounds for the defendants' removal. *See Noriega-Lopez v. Ashcroft*, 335 F.3d 874, 884–85 (9th Cir. 2003) (BIA lacked statutory authority to enter Noriega-Lopez's removal order because, under section 1229a(a)(1)–(3) the "BIA authority does not include entry of orders of removal for [noncitizens] against whom no such order was issued by the IJ") (internal quotation marks and citation omitted); *United States v. Valdivia-Flores*, 876 F.3d 1201, 1210 (9th Cir. 2017) ("Because Valdivia-Flores's drug trafficking conviction does not qualify as an aggravated felony under the categorical approach, it cannot support the asserted basis for Valdivia-Flores's 2009 removal.")

Zavala does not to point to authority that would allow me to void his removal order on statutory grounds. Instead, *Karingithi* and *Aguilar Fermin* compel me to apply the regulatory requirements to determine whether jurisdiction properly vested in the immigration court. *Karingithi* unambiguously states that section 1229 "is silent as to the jurisdiction of the Immigration Court." 913 F.3d at 1160. As discussed above, the IJ properly asserted jurisdiction in Zavala's case because "the regulations expressly state that the omission of an address from an NTA may be fixed by a later hearing notice." *Aguilar Fermin*, 958 F.3d at 895; *see also United States v. De Leon,* No. CR 19-00422 WHA, 2020 WL 2768959, at *1 (N.D. Cal. May 28, 2020) ("Because *Karingithi* is controlling, this order will not address defendant's arguments that that time-and-place information is required in an NTA under 8 U.S.C. § 1229(a) and accordingly that the agency lacked statutory authority to conduct removal proceedings for those reasons.") (internal quotation marks omitted)

This case is unlike the extreme circumstances in *United States v. Lopez-Macias*, No. ED CR 19-00147-FMO, 2020 WL 2946059, at *3 n.4 (C.D. Cal. Jun. 2, 2020), which differentiated itself from *Aguilar Fermin*. In that case, "the information in the NTA was so erroneous as to be misleading" because it listed a date that was eighteen days before the NTA was served on defendant and directed him to appear before the IJ at midnight. *Id.* The government also did not

1  introduce any evidence that the erroneous information in the NTA was subsequently remedied. *Id.*
2  Here, Zavala's defective NTA was subsequently remedied by the corrected NOHs, he attended
3  each hearing, and his attorney was able to file documents on his behalf at the correct location. *See*
4  Choi Decl., Ex. M (notice of appearance filed by Gauthier); Gauthier Decl., Ex. A (bond motion
5  with supporting exhibits filed by Gauthier).[3]

6  Zavala's first motion to dismiss the indictment is DENIED.

**II.  SECOND MOTION TO DISMISS**

Zavala alternatively argues that he is entitled to dismissal of the indictment because he satisfies the requirements for a collateral attack of his underlying removal order under 8 U.C.S. § 1326(d). Second MTD 1. To challenge an underlying removal order in a criminal case alleging illegal reentry, a defendant must demonstrate that he "(1) exhausted any administrative remedies that may have been available to seek relief against the order; (2) the deportation proceedings at which the order was issued improperly deprived the [defendant] of the opportunity for judicial review; and (3) the entry of the order was fundamentally unfair." 8 U.S.C. § 1326(d). A removal order is fundamentally unfair if "(1) a defendant's due process rights were violated by defects in his underlying deportation proceeding, and (2) he suffered prejudice as a result of the defects." *United States v. Alvarado-Pineda*, 774 F.3d 1198, 1201 (9th Cir. 2014).

Zavala asserts that his due process rights were violated in three ways: (i) his immigration counsel, Gauthier, was ineffective; (ii) the IJ failed to obtain a knowing and voluntary wavier of the right to counsel; and (iii) the IJ failed to conduct his voluntary departure proceedings properly. Second MTD 1. There are weaknesses in each of these arguments, but even if I find that a due process right was violated, Zavala has not established that he suffered prejudice. It is not plausible that the IJ would have granted him voluntary departure, as the remainder of this Order demonstrates. Because Zavala failed to show that his removal order was fundamentally unfair, I need not address the other requirements of section 1326(d). *See Alvarado-Pineda*, 774 F.3d at

---

[3] I note that appearance at the hearing cannot, by itself, cure a defective NTA. *See Gutierrez-Ramirez*, 2019 WL 3346481, at *8 (Defendant's "appearance at the [removal proceeding] does not change th[e] result because the hearing [was] void for lack of jurisdiction and his opportunity to be heard was not a fair one") (internal quotation marks omitted).

1203.

### A. Prejudice

To prove prejudice, a defendant seeking a discretionary form of relief "must make a 'plausible showing' that an IJ presented with all of the facts would exercise discretion in the [defendant's] favor." *United States v. Gonzalez-Flores*, 804 F.3d 920, 927 (9th Cir. 2015). "[T]he defendant bears the burden of proving prejudice under [section] 1326(d)(3)." *Id.*[4]

When a defendant claims apparent eligibility for voluntary departure, the Ninth Circuit applies a two-step analysis to determine whether a defendant has demonstrated prejudice from underlying due process violations. *Gonzalez-Flores*, 804 F.3d at 927. First, a court considers "the positive and negative factors an IJ would consider relevant to an exercise of discretion." *Id.* Positive factors include "long residence, close family ties to the United States, and humanitarian needs." *Id.* Negative factors include "the nature and underlying circumstances of the deportation ground at issue; additional violations of the immigration laws; the existence, seriousness, and recency of any criminal record; and any other evidence of bad character or the undesirability of the applicant as a permanent resident." *Id.*

Second, a court determines whether the defendant has carried his "burden of proving it was plausible (not merely conceivable) that the IJ would have exercised his discretion in the [defendant's] favor." *Gonzalez-Flores*, 804 F.3d at 927 (citation omitted). To assess plausibility, a court focuses on whether defendants with similar circumstances have received relief. *Id.* at 928. "Establishing plausibility requires more than establishing a mere possibility," and the existence of

---

[4] The government and Zavala disagree on the proper standard to show prejudice. The government argues that demonstrating prejudice requires Zavala to show that he "*would have*" received "some form of relief from removal had his rights not been violated in the removal proceedings." *United States v. Valdez-Novoa*, 780 F.3d 906, 914–15 (9th Cir. 2015) (emphasis added). But Zavala contends that he need not show that he "would have received immigration relief"; rather he need only show "some evidentiary basis on which relief *could have* been granted." *Raya-Vaca*, 771 F.3d at 1207–08 (emphasis added).

Regardless of whether the standard is articulated as "could have" or "would have", the point is that Zavala must show that relief was plausible, rather than merely conceivable or possible. Both *Raya-Vaca* and *Valdez-Novoa* cited to *United States v. Barajas-Alvarado*, 655 F.3d 1077, 1089 (9th Cir. 2011), in which the Ninth Circuit held that a noncitizen "seeking to prove prejudice need not establish that he *definitely would have* received immigration relief, but only that he had 'plausible grounds' for receiving such relief." (emphasis added).

14

a single case on point is insufficient to establish plausibility. *Id.* at 927–28 (internal quotation marks and citations omitted). The parties agree that Zavala was statutorily eligible for pre-hearing voluntary departure, but dispute whether it was plausible that he would have received it.

Zavala makes several arguments regarding his positive equities. He financially supported his two daughters, ages six and eight, who were United States citizens. Gauthier Decl., Ex. A (bond motion with supporting exhibits). A California court awarded him sole legal and physical custody of his daughters after his ex-wife absconded to Arizona in violation of their joint custody order. *Id.* He was in a committed relationship with, lived with, and helped financially support Ana Maria Olea, a legal permanent resident of twenty-two years. *Id.*; Zavala Decl. ¶ 5. He also lived with and helped support Ms. Olea's three young children, all of whom were United States citizens. Gauthier Decl., Ex. A. He had been living in the United States for nearly twelve years and was employed that entire time, working as a laborer in the fields, as a cook at a Chinese restaurant, and at a lumber mill. Zavala Decl. ¶ 4. If he was granted voluntary departure, he would have had the means to pay for his travel to Mexico. *Id.* ¶ 23.

Zavala argues that these positive equities would have mitigated his negative equities. Second MTD 11. He had no aggravated felonies. He had only one felony conviction in 2008 for dissuading a witness and a misdemeanor for spousal battery, both arising out of a singular event involving his ex-wife, with whom he had no contact since the dispute more than five years ago. Choi Decl., Ex. B (court records from Mendocino County Superior Court). His only other convictions were two Fish and Game violations related to possession of a wild pig. Suppl. Kleinwaks Decl., Ex. C (court records from Lake County Superior Court).[5]

Zavala cites a number of Ninth Circuit and BIA cases that have concluded that defendants

---

[5] Zavala was also charged with several weapons-related offenses in the same incident involving the wild pig, but those charges were dropped. Suppl. Kleinwaks Decl., Ex. C. An IJ would have been able to consider Zavala's weapons-related arrest, but would have given it little weight. *See United States v. Ramirez-Gonzalez*, No. 5:14-CR-00407-BLF-1, 2016 WL 3670045, at *11 (N.D. Cal. Jul. 11, 2016) (in light of the Ninth Circuit's ruling in *Paredes-Urrestarazu v. U.S. I.N.S.*, 36 F.3d 801, 810 (9th Cir. 1994) and the BIA's ruling in *In Re Arreguin De Rodriguez*, 21 I. & N. Dec. 38, 42 (BIA 1995), defendant's domestic violation charges, which were ultimately dismissed, would have been "given only little weight," but "that is not no weight").

with worse criminal records had plausible grounds to receive voluntary departure. Second MTD 12 n.3. But, as the government correctly points out, these cites focus on criminal history in isolation and do not involve or discuss defendants with a similar immigration history as Zavala. United States' Opposition to Defendant's Second Motion to Dismiss the Indictment [Dkt. No. 47] 11–12.[6]

At the time of the removal hearing in 2013, Zavala had been apprehended at the border seven times between 2002 and 2004 and been granted voluntary return in 2008 following his conviction for dissuading a witness and spousal battery. Avneri Decl., Ex. A; Choi Decl., Ex. C. Zavala argues that the government overstates the seriousness of these border apprehensions and conflates them with voluntary returns. Reply to Government's Opposition to Second Motion to Dismiss the Indictment ("Second MTD Reply") [Dkt. No. 51] 10 n. 4. In response, the government submits an exhibit which shows that ICE processed the seven apprehensions as voluntary returns. Second Declaration of AUSA Jason Kleinwaks [Dkt. No. 52-1], Ex. A.[7] At the hearing, Zavala argued that ICE's use of the term "voluntary return" is a misnomer and does not alter the legal character and significance of the informal border turnarounds.

I am not convinced that an IJ would make this distinction and find that multiple border turnarounds, some of which occurred within days of each other, are not negative equities like multiple voluntary returns. Zavala cites *Tapia v. Gonzales*, 430 F.3d 997, 1004 (9th Cir. 2005) to emphasize the "informality surrounding a turnaround at the border." Second MTD Reply 10 n. 4. *Tapia* discussed border turnarounds in the context of evaluating whether the noncitizen had

---

[6] Some of Zavala's BIA case citations are unpersuasive for a separate reason. *See In re Villalongja Mante*, 2007 WL 1676929 (BIA May 18, 2007); *In re Reyes-Jimenez*, 2004 WL 2418597 (BIA Oct. 4, 2004); *In re Guillermo Ramirez*, 2005 WL 698425 (BIA Mar. 8, 2005); *In re Hernandez-Barreto*, 2004 WL 2943517 (BIA Oct. 29, 2004). The Ninth Circuit has found these exact citations unpersuasive because it was "unmoved by cases where the Board merely agreed to remand to the IJ to consider" whether to grant voluntary departure to a noncitizen with fewer negative equities because "such remands tells us little about the Board's standards or practices." *Valdez-Novoa*, 780 F.3d at 919. It was also "equally unpersuaded by cases where the Board has remanded to the IJ to consider whether to grant voluntary departure to lawful permanent residents with criminal histories. *Id.* at 920.

[7] The government's motion for leave to supplement the record with relevant documents received from ICE on July 16, 2020 is GRANTED. United States' Motion For Leave to Supplement the Record. [Dkt. No. 52].

16

continued presence in support of his cancellation of removal relief claim. But it is not necessarily informative about how "serious" these immigration violations are or how heavily an IJ would weigh them in a voluntary departure analysis.

Zavala's reliance on *Raya-Vaca*, where the Ninth Circuit found that withdrawal relief was plausible despite at least six illegal reentries and five prior grants of voluntary departures, is also unhelpful in the analysis I must conduct here. Second MTD Reply 10 (citing *Raya-Vaca*, 771 F.3d at 1210). He does not explain why plausibility for one kind of relief necessarily informs plausibility for another kind of relief. Although "recidivist immigration violators are permitted to withdraw their applications for admission," Zavala has not made a convincing argument that the same would be true in the context of voluntary departure. *See Raya-Vaca*, 771 F.3d at 1209; *see also United States v. Angulo-Galaviz*, No. 17CR3671-CAB, 2018 WL 1942367, at *5 (S.D. Cal. Apr. 25, 2018) (four prior voluntary returns "demonstrate[ed] recidivist immigration violations" but did not weigh against defendant as a "previous finding[] of inadmissibility," which is one of the factors considered in a noncitizen's request to withdraw application for admission).

Zavala cites *United States v. Cabrera-Ochoa*, No. 5:15-CR-00206-BLF-1, 2016 WL 4204551, at *14 (N.D. Cal. Aug. 8, 2016) to argue that his single illegal reentry "is not in itself a strongly negative equity." Second MTD Reply 9. In that case, the government cited multiple unpublished BIA decisions affirming an IJ's finding that an illegal reentry subsequent to a grant of voluntary departure was a "substantial adverse factor." *See In Re: Luis Bernardo Hernandez*, 2016 WL 946729, at *2 (BIA Feb. 10, 2016) (affirming denial of an eleventh grant of voluntary departure, but noting that respondent received ten grants of voluntary departure, and each time illegally reentered); *In Re: Miguel Alberto Ornelas-Caro*, 2015 WL 799752, at *2 (BIA Jan. 13, 2015) (affirming denial of a third grant of voluntary departure, but noting that respondent received two grants of voluntary departure, and each time illegally reentered). Judge Freeman found that those BIA cases showed that it was plausible that Cabrera-Ochoa would be granted a voluntary departure, as it was only his second. 2016 WL 4204551, at *14. That is not the case here. Zavala was not only granted voluntary departure in 2008, but also had seven border turnarounds between 2002 and 2004.

17

Zavala identifies *United States v. Rojas-Osorio*, 381 F. Supp. 3d 1216 (N.D. Cal. 2019) as the most similar match that supports the plausibility of his voluntary departure claim. Second MTD Reply 6. Defendant in that case had two United States citizen children, his partner and mother of his children also lived in the United States with him for nine years, he had worked as a housecleaner since he arrived, and people with same or even worse criminal histories had been granted voluntary departure in the past. *Id.* at 1232. But there was no discussion of a past immigration history like Zavala's. Even if the case was persuasive in Zavala's favor, a single case citation is not enough. *Valdez-Novoa*, 780 F.3d at 920 ("[T]he existence of a single case that is arguably on point mealy on that it is 'possible' or 'conceivable' that a similarly situated [noncitizen] would be afforded voluntary departure.").

Zavala also offers the declaration of a licensed immigration law practitioner who attests that he "could very likely have received voluntary departure if his case had not been severely prejudiced by his prior counsel's [ineffectiveness]." Declaration of Michelle M. Smith in Support of Second Motion to Dismiss [Dkt. No. 51-1] ¶ 7. While courts have credited the contents of such declarations to find plausibility, it is usually coupled with strong indication from the case law. *See United States v. Reyes*, 907 F. Supp. 2d 1068, 1079 (N.D. Cal. 2012). One expert's declaration cannot make up for the fact that Zavala has not pointed to favorable case law.[8]

In making the plausibility determination, I must consider how an IJ would look at the record. The cited case law simply does not provide analogous support to establish that a grant of voluntary departure was plausible in Zavala's case. While he has a number of positive equities, he has failed to make a convincing argument that his immigration record (*i.e.*, seven border turnarounds between 2002 and 2004 and voluntary return in 2008), when coupled with his criminal record, would not have outweighed it, making the IJ's exercise of discretion in his favor implausible.[9]

---

[8] Because I do not give this declaration much weight, the government's motion for leave to file a sur-reply to challenge the qualifications of Zavala's expert witness is DENIED. United States' Motion for Leave to File Sur-Reply Addressing the Declaration of Michelle M. Smith [Dkt. No. 53].

[9] Zavala's motion primarily focuses on pre-hearing voluntary departure, but he also argues that he

18

Because Zavala fails to demonstrate that voluntary departure relief was plausible, his second motion to dismiss is DENIED.

## CONCLUSION

For the foregoing reasons, Zavala's motions to dismiss the indictment are DENIED. A status conference is set for September 3, 2020.

**IT IS SO ORDERED.**

Dated: August 19, 2020



William H. Orrick
United States District Judge

---

never had the opportunity to apply for post-hearing voluntary departure. Second MTD 19 n.5. Assuming that he would have been eligible for post-hearing voluntary departure relief, he has failed to show it is plausible that he would have received such relief given the balance between his negative and positive equities.

19